# EXHIBIT 3

# THE GOODHEART FIRM, P.C.

ATTORNEYS AT LAW

MARK B. GOODHEART, Principal
mark@thegoodheartfirm.com

Of Counsel, Feldman Shepherd
mgoodheart@feldmanshepherd.com

June 6, 2023

*VIA EMAIL ONLY*
The Plexus Group, LLC
21805 W. Field Pkwy, Suite 300
Deer Park, IL 60010
Attn.: Ms. Jonie Gould

      RE: *Alba, et. al. v. 15th Street Lighthouse, LP, et. al.*
         Phila. Ct. Com. Pl., May Term 2023, No. 41597

Dear Ms. Gould:

  I hope this letter finds you well.

  I represent PIP Property Management ("PIP") and JBMP Group, LLC ("JBMP"). PIP and JBMP have been named in the above-referenced lawsuit along with 15th Street Lighthouse, LP ("Lighthouse") regarding allegations of negligence in regard to incidents that occurred at 1330 N. 15th Street, Philadelphia, PA 19121 (the "Property") on November 11, 2022. Lighthouse is the owner of the Property. I enclose a copy of the Complaint that has been filed in this matter.

  PIP is the manager for the Property pursuant to a Real Property Management Agreement dated August 19, 2021. JBMP is the Broker for the Property pursuant to a Listing Agreement dated August 17, 2021. My understanding is that Plexus is the broker for Lighthouse and has secured its general liability and property coverage for this Property.

  Pursuant to the Real Property Management Agreement and Listing Agreement, Lighthouse has a contractual obligation to provide complete defense and indemnity for both PIP and JBMP. A copy of these agreements is enclosed as well. Please reference paragraphs 10(B) and 3(C) respectively. Accordingly, I am providing notice of this lawsuit and tendering defense and indemnity to Lighthouse on behalf of PIP and JBMP.

  Please provide this notice letter and communicate the obligation for defense and indemnity to Lighthouse's general liability carrier without delay. Time is of the essence as PIP

The Plexus Group, LLC
Attn.: Ms. Jonie Gould
RE: *Alba, et. al. v. 15th Street Lighthouse, LP, et. al.*
June 6, 2023

and JBMP have both been served with the Complaint and the time for a response is ticking. Presumably, Lighthouse has been served as well.

  Please also provide my information to the general liability carrier's adjuster that is assigned to this matter and provide his/her information to me as well. It is important that we connect as soon as possible to discuss this matter. I have been in touch with Plaintiffs' counsel regarding the response deadlines and can provide helpful information.

  If you need to discuss this further, please do not hesitate to contact me.

  Please stay well.

              Very truly yours,

              Mark B. Goodheart

Enclosures

# LISTING AGREEMENT

# EXCLUSIVE RIGHT TO RENT REAL ESTATE

THIS EXCLUSIVE LISTING AGREEMENT (this "<u>Agreement</u>") made as of August 17, 2021 (the "<u>Effective Date</u>"), by and between 15th Street Lighthouse LP ("<u>Owner</u>") and JBMP Group, a ("<u>Broker</u>"). **WHEREAS**, Owner is the fee simple owner of certain real property and the improvements thereon located at

1330 N 15th Street Philadelphia, PA 19121

(the "<u>Property</u>"); and

**WHEREAS**, Owner desires to exclusively retain Broker to provide certain services in connection with Owner's operation and leasing of the Property, and Broker desires to provide such services on behalf of Owner, as more particularly set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the promises and the agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  **Engagement of Broker**.  Owner hereby engages Broker, and Broker hereby accepts engagement and appointment, as Broker for the Property.

2.  **Scope of Services**.

    A.  Broker shall furnish the Services (as defined in Section 2(B) below) with promptness and diligence.  Broker agrees to use reasonable efforts in the timely performance of its obligations under this Agreement.  Broker hereby acknowledges and agrees that Owner is retaining Broker to perform the Services based on the experience, knowledge and skills of Broker and its employees or independent contractors.

    B.  Broker shall provide the following services in connection with the Property (such services hereinafter collectively referred to as the "Services):

    (1)  procure potential tenants, processing applications, and leases with such potential tenants;

    (2)  preparing leases for signatures by the potential tenant(s) and Owner, collecting application fees and rent monies paid with applications from Tenants selected and chosen by Owner; and

    (2)  all other services and acts as may be reasonably necessary or appropriate to fulfill its obligations under this Agreement.

    C.  Broker shall keep and maintain records, which will include copies of all written correspondence, applications, leases, and other relevant written information regarding the Property, and Owner shall have the right to inspect such records insofar as they relate to Services rendered under this Agreement at such reasonable times and at such reasonable locations as the parties may agree upon written request by Owner to Broker.

    D.  Broker shall have the power and right to procure leasing applications for Owner (each, an "<u>Application</u>", and collectively, the "<u>Applications</u>") and to procure leases (each, a "<u>Lease</u>", and collectively, the "<u>Leases</u>") on behalf of Owner in accordance with leasing guidelines established by Owner from time to time and/or in accordance with paragraph 14(R) below. All Leases shall be promptly delivered to Owner for review and execution, it being understood that Broker shall not be authorized to execute any Leases on behalf of Owner and Owner shall accept or reject tenants and execute leases at Owner's sole discretion and in accordance with paragraph 14(R) below.  Nothing contained herein or otherwise in this Agreement, or Owner and Broker's relationship and dealings, shall be construed as Owner relying on representations or

1

opinions of Broker regarding Owner's decision to accept or reject potential tenants, their applications and/or execute leases. Owner acknowledges that it decides to accept or reject a potential tenant at its sole discretion and decision.

E. Unless otherwise requested by Owner in writing and agreed to by Broker, Broker shall collect an application fee and deposit for the first month of rent, last month rent, and security deposit due under the applicable Application or Lease upon execution and delivery of such Application and no later than execution of Lease (collectively, a "Pre-Lease Deposit"). Broker shall hold these funds once collected and until no later than the date of the commencement of the lease. No later than the commencement of the lease term, or sooner as decided solely by Broker, Broker shall pay to Owner or its designee the first month of rent, last month rent, and security deposit, less the deduction of Broker's fee. Broker shall also be entitled to retain all non-refundable application fees collected from the tenant applicants. So long as Broker has made reasonable efforts to request the payment of the Pre-Lease Deposit, Broker shall not be held responsible for a tenant's failure to pay (in part or in full) the Pre-Lease Deposit of first, last and security. Broker shall not commingle the Pre-Lease Deposits with any other funds of Broker and shall provide reasonable evidence to Owner of the same upon Owner's request.

F. Owner shall be responsible to deliver the leased premises covered by each Application and/or Lease in a timely manner in accordance with the terms of the applicable Application and/or Lease. If Owner fails to timely deliver any leased premises pursuant to the applicable Application and/or Lease and such Application and/or Lease is terminated as a result of such failure, Owner shall reimburse the applicable tenant for his or her Pre-Lease Deposit within ten (10) days following the termination of such Application and/or Lease (or, if such Pre-Lease Deposit is still being held by Broker then Broker shall have the right to return it to Tenant, or to turn it over to Owner for Owner to do the same, upon receipt of notice from all parties that the Lease is terminated). Broker shall be entitled to retain its fee for services and application fees paid by Tenants even if Owner fails to timely deliver the applicable leased premises to Tenant and upon this occurrence Owner is responsible for making full payment owed to Tenant and all fees for services to Broker.

3. **Representations and Warranties**. Each party hereto represents and warrants to the other that it is duly organized and authorized to enter into this Agreement and to perform all of its obligations set forth herein, and is not a party to any agreement with a third party which would restrict its ability to perform its obligations hereunder.

4. **Term and Termination**.

A. The term of this Agreement shall be for a period commencing on the Effective Date and terminating on the date which is twelve (12) months from and after the Effective Date. By law, the term of a listing agreement may not exceed 1 year. Notwithstanding the foregoing, either party shall have the right to terminate this Agreement, for any reason or no reason whatsoever, upon written notice to the other party, whereupon neither party shall have any further obligations or liabilities under this Agreement, except with respect to the payment for services already performed, the confidentiality provisions in this Agreement and except as otherwise expressly set forth in this Agreement. Any termination of the Real Property Management Agreement between Owner and PIP Property Management, LLC shall automatically constitute a termination of this Agreement. Broker and Owner acknowledge that some responsibilities of Owner under this Agreement may be performed by PIP Property Management, LLC pursuant to a separate contract between PIP and Owner.

B. Upon termination by Owner, should any pending applications, leases, deposits and/or move-ins exist for any of Owner's Property listed above, Broker shall have the option to conclude its work on such Property or Broker may deliver all pertinent information to Owner and Owner shall then be solely responsible for its Property and the pending applications, leases, deposits and/or move-ins. Termination by Owner shall under no circumstances relieve Owner for payment to Broker of the fees owed pursuant to Section 5 and this Agreement. So long as there are pending applications for a Property at the time of termination then Owner shall owe to Broker a single full fee (pursuant to Section 5) for each unit/apartment for which at least a single pending qualified application exists (regardless of whether such applications result in a signed lease).

C.  Upon any termination of this Agreement by Owner, Owner shall pay to Broker any amounts owed to Broker under Section 5 of this Agreement for the period of time ending on the date of termination and as set forth in section 4(B) above.  Any such payment shall be delivered to Broker within seven (7) days following the termination of this Agreement or if Broker is holding funds related to the Pre-Lease Deposit then Broker shall have the right to deduct its fee upon termination by Owner.  Broker is only responsible for delivering such funds to Owner that have been received by Broker as of the date of termination and Owner is responsible for the collection of all other monies owed by a tenant.

D.  Upon any termination of this Agreement, Broker shall deliver to Owner all books and records in the Broker's possession relating to the Property.

5.  **Fees**.  As compensation for rendering the Services under this Agreement, Broker shall be entitled to retain 100% of First Month's Rent for each Unit/Apartment. Broker is also entitled to retain **application fees paid by prospective applicants** for each Application and Lease procured on behalf of Owner for the Property.

If the responsibility for renewal is assigned to Broker (which it is for all "property management" clients of PIP) then Broker shall be entitled to fee of $250 per renewal for securing a successful renewal.  If the responsibility for relocating an existing tenant to another unit in the Property is assigned to Broker (which it is for all "property management" clients of PIP) then Broker shall be entitled to fee of $250 per relocation.

If the Owner opts at any time to use Broker to assist with securing a sublet, then Broker is authorized to **charge the sublessor Tenant** $400.00 for such service per individual sublessee.

In addition, Broker shall be reimbursed for the reasonable, out-of-pocket expenses incurred by Broker in connection with the performance of its obligations hereunder, so long as any such expenses are expressly approved in advance by Owner.  In connection with any such reimbursement, Broker shall provide Owner with an itemized invoice for such out-of-pocket expenses, together with all reasonable supporting information regarding the same.  All approved reimbursements shall be paid by Owner to Broker within thirty (30) days of Owner's receipt of itemized invoices and supplemental information.

6.  **Exclusivity**.  Owner agrees and understands that Broker is the sole firm/individual providing the services set forth above in Section 2 for Owner for the above-listed properties and Owner is prohibited from engaging another company/individual/broker from providing the same and/or substantially the same services for Owner for the properties listed above.  This is a material term of this Agreement and the fees set forth are based upon this exclusivity.  Owner acknowledges that should Owner violate this provision then it will cause immediate and irreparable harm to Broker for which Broker is allowed to pursue all remedies available under the law.

7**.**  **Confidentiality**.  Owner and/or its affiliates may furnish Broker with certain Confidential Information (written or oral) which is either non-public, confidential or proprietary in nature.  For purposes of this Agreement, the term "Confidential Information" shall mean any and all information furnished to Broker with respect to Owner and/or the Property, including, without limitation, any and all plans, surveys, studies, memoranda, computer-stored data, records, financial information, and the like, which is not in the public domain, intended for the public domain or that is designated by Owner as "Confidential Information.".  In consideration of Owner furnishing Broker with the Confidential Information, Broker shall keep the Confidential Information protected from public dissemination and shall not, without Owner's prior written consent, disclose any Confidential Information in any manner whatsoever, in whole or in part, and Broker shall not use or disclose the Confidential Information in any manner whatsoever, in whole or in part, other than in connection with providing the Services required in this Agreement or as otherwise required by law (as advised by counsel).

Owner shall keep the terms of this Agreement confidential and shall not disclose the terms to any third parties unless ordered by a Court of law.

8.  **Successors and Assigns**.  The covenants and agreements contained in this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

9.        **Assignment**.  This Agreement may not be assigned by either party without the prior written approval of the other non-assigning party, which approval shall not be unreasonably withheld, conditioned or delayed.  Any unauthorized assignment by a party without such required approval shall be deemed null and void *ab initio*.

10.       **Indemnification**.

   A.    Broker shall defend, indemnify, and hold Owner and Owner's partners, members, officers, directors, employees, successors and assigns harmless from any liability, loss, damage, fees, costs and expenses (including reasonable attorneys fees), judgments, or amounts paid in settlement incurred by reason of any demands, claims, suits, actions, or proceedings arising out of or related to, but only to the extent any such loss or damage is caused by, the (1) gross negligence, (2) bad faith, (3) fraud, (4) willful misconduct, or (5) breach of fiduciary duty by Broker or any of its partners, members, officers, directors, employees or agents in connection with the performance of Broker's obligations under this Agreement. The foregoing indemnity obligations shall survive the termination of this Agreement.

   The obligation to defend pursuant to this paragraph 10 shall be separate and owing from Broker from the obligation to indemnify and shall accrue immediately upon Owner's need for a defense to any of the claims set forth in this paragraph 10(a).

   B.    Owner shall defend, indemnify, and hold Broker and Broker's partners, members, officers, directors, employees, successors and assigns harmless from any liability, loss, damage, fees, costs and expenses (including reasonable attorneys fees), judgments, or amounts paid in settlement incurred by reason of any demands, claims, suits, actions, or proceedings (collectively referred to herein as "claims") arising out of the (1) negligence, (2) bad faith, (3) fraud, (4) willful misconduct, or (5) any other negligent or wrongful act or omission of Owner or any of its partners, members, officers, directors, employees or agents in connection with the performance of Owner's obligations under this Agreement or any claims arising out of or related to Owner's ownership or leasing of any of Owner's properties for which Broker performs services.  Subject to section 10(A), Owner also agrees to Indemnify, defend and hold harmless Broker/Manager, and all persons in Broker's firm or acting on behalf of Broker's firm,  from  all costs, expenses, suits, liabilities, damages, attorney fees and claims of every type arising out of performance of services under this Agreement or related in any way to this Agreement, including but not  limited to those arising out of injury or death of any person, or damage to any real or personal property of  any person, including Owner or Owner's representatives, Broker or Broker's agents/representatives and all third-parties.

   The obligation to defend pursuant to this paragraph 10 shall be separate and owing from Owner from the obligation to indemnify and shall accrue immediately upon Broker's need for a defense to any of the claims set forth in this paragraph 10.

    Notwithstanding the foregoing, Owner shall not be required to indemnify Broker with respect to any liability, loss, damages, cost or expense, to the extent such is caused by the gross negligence, willful misconduct or bad faith of Broker or employees of Broker.

   Owner shall not be required to personally indemnify Broker with respect to any liability, loss, damage, cost or expense to the extent that the same is covered by proceeds received by Broker pursuant to insurance maintained by Owner, but Owner shall be responsible for covering any gaps between coverage and such claim/loss/expense.  Owner's insurance shall be primary and exclusive for all claims, liability, loss, damage, cost or expense arising out of Owner's responsibility for indemnification hereunder and Broker shall have no requirement to pursue a claim with its own insurance company.

The foregoing indemnity obligations shall survive the termination of this Agreement.

   C.    Owner further agrees to indemnify, defend and hold Broker harmless from any claims related to any violations of over-occupancy laws or any other restrictions on occupancy, whether imposed by a governmental agency, condominium association, city or township or otherwise.  This includes but is not limited to the maximum three unrelated individuals' laws of The Philadelphia Code.  Owner shall be responsible to

4

defend any action brought to enforce any such restrictions and Owner shall be responsible for any fines, judgments or loss of income related to such violations.

   D. Owner's properties shall be safe for entrance and occupancy during the time Broker is performing services under this Agreement and Owner shall be responsible for, and indemnify Broker from, costs, expenses, suits, liabilities, damages, attorney fees and claims of every type arising out of incidents occurring on or in Owner's property and caused by any defect in the property or negligence of Owner.

   E. Upon execution of this Agreement, Owner shall provide Broker with proof of all insurances carried by Owner and limits for each such insurance. Owner shall at a minimum carry general liability insurance with minimum limits of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate. Such proof of general liability insurance shall specifically name Broker as an additional insured. Failure to provide such proof of insurance and name Broker as additional insured shall be grounds for Broker to immediately terminate this Agreement.

   F. The indemnification provisions of this paragraph 10 are specifically reiterated in certain other sections of this Agreement. It is expressly understood that the provisions of this paragraph 10 apply to the entirety of this Agreement whether or not they are specifically reiterated elsewhere.

11. **Applicable Law**. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the principles of conflicts of law.

12. **Severability of Provisions**. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

13. **Notices**. No notice or other communication shall be deemed given unless delivered in accordance with the terms of this Section 13. Any notices hereunder shall be in email or writing and shall be deemed given to any person at the email/mailing address set forth below. Notices shall be addressed as follows (or such other persons as a party may designate in writing to the other parties):

   If to Broker:  Maria Pacitti
         1133 E Columbia Ave
         Ste 101
         Philadelphia PA 19125
         Attn: Maria Pacitti
         maria.pacitti@jbmpgroup.com

   If to Owner:  15th Street Lighthouse LP
         P.O. Box 15010, Philadelphia, PA 19130
         Attn: Rickey Biddle

14. **Miscellaneous**.

   A. **Independent Contractor**. Broker shall at all times hereunder be and act as an independent contractor and, as such, no law or anything in this Agreement or in the relationship being established and developed hereunder shall be deemed, nor shall it cause, Owner and Broker to be treated as partners, agents, joint ventures, employer/employee or otherwise as joint associates for profit or cause any benefits to be conferred upon officers, employees or agents of either party by the other except for those expressly set forth herein.

   B. **Amendment**. This Agreement may be amended only by written agreement of the parties.

   C. **Headings**. The titles and headings of the various sections and paragraphs in this Agreement are intended solely for convenience of reference and are not intended to explain, modify or place any construction or limitation upon any of the provisions of this Agreement.

D.  **No Implied or Other Waiver**. The failure of either party to this Agreement to insist at any time on the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed appropriate by those parties.  No term, provision or clause of this Agreement shall be deemed waived and no breach excused unless such waiver or consent shall be in writing and executed by a duly authorized representative of the party to be bound thereby.  Any consent by any party to, or waiver of, a breach by the other, whether express or implied, shall not constitute a consent to, waiver or, or excuse for any other different or subsequent breach.

E.  **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute a single agreement.

F.  **Emails**.  The parties acknowledge and agree that copies of executed documents received via email or facsimile shall be deemed to be originals for all purposes.

G.  **Liability for Quality of Prospective Tenants.**   If the Owner approves the tenant's application that the Broker sends to the Owner, then Broker shall not be liable to the Owner for any conduct of the tenant for any reason, including but not limited to if the tenant is not a quality tenant, does not pay rent, defaults under the lease in any other manner, or is not up to the standard of the Owner for any reason or for no reason. Broker is not responsible to return the leasing fee or any other monies paid by Owner to Broker should Owner not wish to keep the tenant for ANY reason.  Broker shall only be responsible for providing Owner with an accurate copy of the written application submitted by a prospective tenant and all review and decision-making shall be the sole responsibility of Owner.  Broker is not responsible for any verbal comments made by prospective tenant to Broker during the showing and/or application process and Broker has no duty to transcribe or inform Owner of verbal information provided by prospective tenant during this process.  Owner agrees to rely solely on the completed rental application (or information independently obtained by Owner) in determining whether or not to accept, approve and/or disapprove a prospective tenant.

H.  **Tenant Contact Information and Notification**.  For notification purposes, Owner agrees to provide to Broker all unit names and associated current tenant first names, last names, and emails (template attached). Owner agrees to allow Broker to Notify residents 24 hours in advance through email of scheduled showing or other need for access.  If owner does not provide tenant contact information or supplies incorrect information (and the unit is occupied), Broker will notify owner of the showing/required access instead and it is Owner's responsibility to notify tenants. Accordingly, Broker is not liable for any consequences, including but not limited to a breach of lease by Owner, from failure to properly notify tenants on behalf of Broker.

I.  **Keys**.  Owner agrees to provide Broker with key copies or lockbox codes for each unit/property. JBMP is authorized to copy any keys provided including those contained in lockboxes.

J.  **Move-In**.  Owner agrees to properly transition tenant for move-in, on or before move-in day, after first, last, and security deposit are paid, and leases are fully executed.

K.  **Representation Regarding Properties**.  Owner represents and warrants that its Properties are safe, habitable, free from defects and in compliance with all laws and fire codes. Owner is solely responsible for delivering to tenant the property in substantially the same condition as that which tenant expects, including but not limited to in a safe and habitable condition and in compliance with all laws and fire codes.  Broker shall not be responsible for any failures of Owner in this regard and the indemnification provisions of this Agreement set forth in paragraph 10 apply to Owner's responsibility to comply with this paragraph and Owner's responsibility to provide tenant with a safe and habitable property that is in compliance with all laws and fire codes.  Should tenant not accept a property as a result of the condition of the property at move-in then Broker is under no

6

obligation to refund any monies/commissions paid by, or owing from, Owner to Broker.  It shall be Owner's sole responsibility to address/handle any refund and/or return of payments, if any, to a tenant that terminates prior to move-in and/or a tenant that refuses to move into a property at the inception of a lease term due to the condition of the property.  If Broker is holding any funds of Tenant at the time of such a termination by Tenant then Broker is authorized by Owner to return such funds to Tenant and shall promptly do so, less any fees owed to Broker by Owner, and then Broker shall inform Owner of the balance owed by Owner to Tenant, if any, and Owner shall pay the same to Tenant.  Under no circumstances shall Broker be liable to Tenant for any monies owed by Owner or damages claimed by Tenant once any monies, less fees, are returned by Broker to Tenant.

**L.**     **No Discrimination.**  Owner is strictly prohibited from discriminating against prospective tenants and Broker does not authorize any discrimination and shall not be complicit with any discrimination.  Broker practices fair housing and is compliant with all fair housing and anti-discrimination laws, including but not limited to regarding emotional support animals.  Should Broker believe, in good faith, that Owner is discriminating against prospective tenants then Broker shall have the right to immediately terminate this Agreement with written notice to Owner stating the basis for such termination (with all monies owed by Owner to Broker as of termination immediately due to Broker).  It is Owner's responsibility to comply with the Pennsylvania Human Relations Act and all other applicable laws relating to the prohibition of discriminatory housing.  Under no circumstances shall Broker be liable for any violation by Owner of the Pennsylvania Human Relations Act or any other anti-discrimination laws and the indemnification provisions of this Agreement set forth in paragraph 10 specifically apply to Owner's breach of any anti-discrimination laws and any claims filed against Broker due to Owner's negligence or actions that are alleged to have violated such laws or regulations.

**M.**     **Broker's Non-Exclusive Rights.**  Owner agrees that Broker is not working exclusively for Owner and may advertise other properties for other owners and the Broker may show other properties for other owners to prospective tenants.  Broker may show the same prospective tenants properties owned by different owners that Broker is working for, including Owner under this Agreement.

**N.**     **Licenses and Permits.**  Some municipalities require various licenses or permits for landlords and/or properties/units. If required for the contracted properties or units or Owner's business, Owner represents and warrants that Owner has obtained or will obtain the required licenses, occupancy approvals and/or permits to lawfully operate its business and rent its properties.  Owner shall provide copies of all licenses, occupancy approvals and/or permits to Broker and will keep all necessary licenses and permits up to date.

Owner agrees to provide and shall be responsible for providing all related licenses, permits and/or other legally required documents to tenants prior to move-in and/or at the lawfully required time. Owner agrees and understands that such requirements may change from time to time and Owner is responsible for ongoing compliance with all laws related to the Ownership and leasing of the Property.  Under no circumstances is Broker responsible for providing such documentation to tenant. Owner agrees that Owner is responsible for any and all penalties, cease operations or fines that are a result of Owner non-compliance with required licenses, occupancy issues/laws, permits, laws, other legal requirements or any violations assessed.

Owner acknowledges that Broker has no control over the number of occupants actually residing in a property once move-in occurs and Broker is not deciding the number of occupants a property is being advertised/offered for and this decision is solely made by Owner.  Owner acknowledges that it is solely Owner's decision how many tenants to house in a particular property and Broker shall not be responsible for overcrowding or any occupancy violations under any circumstances.

Owner acknowledges that for properties in Philadelphia, PA it is Owner's responsibility to provide Tenant with the current Rental Suitability Certificate prior to tenant move-in but not more than 60 days prior to tenant move-in and to maintain a record of Tenant's acknowledgement or receipt

thereof. Owner acknowledges that for properties in Philadelphia, PA it is Owner's responsibility to provide Tenant with a copy of Owner's Housing Inspection License (Rental License) and all other licenses, certifications or documents required by law, prior to move in or at such other time as required by law, and under no circumstances is Broker responsible for providing such documentation to tenant.

Broker shall provide Tenant with a copy of the Partners for Good Housing Handbook at the time of lease signing.

Owner acknowledges that Broker shall not be liable for any damages incurred by Owner, including but not limited to loss of rents, as a result of Owner's failure to comply with licensing, permitting, zoning, use or other legal requirements for the rental of Owner's property.

Owner's signature of this Agreement is Owner's acknowledgement of the provisions of this Agreement related to licenses, permits, zoning/use and compliance with all laws and by signing this Agreement owner represents and warrants Owner will comply with all laws related to the ownership and leasing of Owner's properties.  Owner should consult an attorney or other knowledgeable professional other than Broker if Owner has any questions or concerns about licenses, permits, zoning/use or other legal requirements for leasing Owner's properties.

The indemnification provisions of this Agreement set forth in paragraph 10 specifically apply to Owner's breach of any responsibilities or the laws/requirements addressed in this paragraph 14(N).

**O.      Lead Paint.** Owner acknowledges that it is Owner's responsibility to provide tenants with the Protect Your Family from Lead In Your Home pamphlet, to provide tenant with any disclosure language related to the presence of lead paint in the property and to comply with all laws related to lead paint.  Owner acknowledges that it is Owner's responsibility to provide Broker with any and all information regarding the presence of lead paint in Owner's property, if any.  Broker is not responsible for performing lead paint testing or investigating whether or not lead paint is present in Owner's property and may solely rely on the information provided by Owner.  Owner acknowledges that the indemnification provisions of this Agreement set forth in paragraph 10 apply to Owner's responsibility to comply with lead paint laws and that Owner is solely responsible for any injury or damages suffered by tenant as a result of lead paint being present in Owner's properties.

**P.      Bed Bugs.** Owner acknowledges that it is Owner's responsibility to provide tenants with disclosure regarding beg bugs in the property and disclosing the presence of bed bugs or the previous presence of bed bugs in the property.  For properties located in Philadelphia, PA, Owner acknowledges that it is Owner's responsibility to provide tenants with disclosure and information regarding beg bugs in compliance with local laws.

**Q.      Tenant Termination Prior to End of Lease Term.**  If tenant backs out of lease agreement for any reason after payment of initial deposit/Pre-Lease Deposit to hold the property, Broker reserves the right to retain its commission, and Broker shall pay any remaining security deposit, first month and/or last month's rent, and any other pre-paid rent (less any commission) over to the Owner. It shall be Owner's sole responsibility to address/handle any refund and/or return of payments, if any, to a tenant that terminates or fails to honor a lease term prior to its end and/or prior to move-in.  This shall be Owner's sole responsibility regardless of whether tenant's failure/refusal to perform is based upon a valid reason, a breach by tenant and/or no reason at all.

If Owner denies an application for any reason, Broker has Owner's express authority to return any monies to tenant that tenant has paid toward the rental of Owner's property and should Broker determine in good faith that monies should be paid back to tenant.

**R.      Application Approval/Denial** If tenant meets all six of the following criteria, Broker reserves the right to administratively approve the applicant on Owner's behalf and collect money and Owner expressly acknowledges that such approval pursuant to this paragraph is being done by Owner, with Owner's express approval and direction, in accordance and compliance with

8

paragraph 14(G) above, and as if actually done by Owner: A) Applicant has a current net income of greater than or equal to 3x the stated rent, B) Applicant has a credit score greater than or equal to 700, C) Applicant has no prior eviction or judgment history, D) Applicant has no prior criminal history, E) Applicant has no prior suit(s) of past Landlords, and F) There are currently no candidates that could be considered stronger. If any one of the criteria is not met, Broker will not administratively approve the applicant and the application will be forwarded to Owner for Owner's review.

For all applicants that do not meet the above-criteria, Owner shall be responsible for reviewing and either approving or disapproving rental applications within twenty-four (24) hours of receipt from Broker.  Should Owner fail to respond within such time frame then Broker shall be free to inform a prospective tenant that Broker is still awaiting Owner review and cannot guarantee the availability of the Property.

Broker may immediately terminate this Agreement should Broker believe in its sole and exclusive judgment that Owner is engaging in discriminatory housing practices.

**S.** **Use of Owner's Lease.**  Broker shall not be responsible under any circumstances for Owner's decision and/or insistence upon the use of a lease and/or lease terms provided by Owner or required by Owner.  Owner acknowledges that Owner assumes all risk related to the use of a lease and/or lease terms provided by Owner (or lease structure required by Owner) including but not limited to the risk that Owner's lease or lease terms contain provisions or clauses that are illegal, discriminatory and/or unenforceable.  Owner specifically acknowledges that Broker has no responsibility to review Owner's lease or lease terms and no responsibility to provide counsel on the legality of such lease or lease terms.  Broker offers Owner a lease for use and if Owner rejects the use of this lease in whole or in part then Owner assumes all risk related to the terms of the lease that is used. Should Owner make use of its own lease, in whole or in part, or require the modification in any way of Broker's lease, then Broker has no responsibility for Tenant understanding of the lease or explaining the lease to Tenant, no responsibility for interpreting the lease or advising tenant on the meaning of the lease and any questions about the lease raised by Tenant shall be referred to Owner.  The indemnification provisions of this Agreement set forth in paragraph 10 specifically apply to this paragraph.

**T.** **Signage.** Owner grants permission to Broker to affix signage on the property advertising that the Property is being leased by Broker.

**U.** **Taxes**.  Owner is responsible for the payment of all federal, state and local taxes related to its collection and/or receipt of rental income.

**V.** **Entire Agreement**.  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter hereof, and supersedes all prior agreements, arrangements and understandings, written or oral, relating to the subject matter hereof.  No representation, promise or inducement has been made by either party that is not embodied in this Agreement, and neither party shall be bound by or liable for any alleged representation, promise or inducement not so set forth.

**W.** **Amendments.**  This Agreement may be amended, modified, superseded, cancelled, renewed or extended and the terms or covenants hereof may be waived, only by a written instrument executed by both parties to this Agreement.

**X.** **Opportunity for Review and Counsel.**  Each party acknowledges and agrees that it has had the opportunity to seek the advice of independent legal counsel and has read and understood all of the terms and conditions of this Agreement.  The terms of this Agreement shall not be construed against either party by reason of their drafting or for a party's claimed lack of understanding of the terms, the subjects covered or the responsibilities undertaken.

**IN WITNESS WHEREOF,** the parties hereto have affixed or caused to be affixed their respective signatures as of the day and year first written above.

**OWNER:**

15th Street Lighthouse LP

| | | |
|---|---|---|
| *Rickey Biddle* (DocuSigned) | **Rickey Biddle** | 8/19/2021 |
| **SIGNATURE** | **TITLE: Manager** | **DATE** |

**BROKER:**

| | | |
|---|---|---|
| *Maria Pacitti* (DocuSigned) | **Maria Pacitti** | 8/19/2021 |
| **SIGNATURE** | **TITLE:** Broker at JBMP GROUP | **DATE** |

10

**REAL PROPERTY MANAGEMENT AGREEMENT**

This Real Property Management Agreement (this "Agreement") is entered into by the person or entity identified as the Owner on the signature page to this Agreement ("Owner") and PIP Property Management, LLC ("Manager"). In consideration of the mutual covenants set forth in this Agreement, the parties, intending to be legally bound, agree as follows:

**1.** APPOINTMENT OF MANAGER:  Owner appoints and grants Manager the exclusive right to manage the property or properties described on Exhibit A to this Agreement (the "Property"), upon the terms set forth in this Agreement. The initial term of this Agreement shall be one (1) year commencing as of the start date set forth on Exhibit A. Thereafter, the term of this Agreement shall automatically renew for successive one year (1) terms. **Either party may terminate Manager's engagement under this Agreement (i) upon written notice of a material breach of this Agreement by the other party (including, without limitation, any failure by Owner to make timely payment in full of any compensation or expenses) or if the other party makes an assignment for the benefit of creditors, becomes subject to a bankruptcy proceeding, is subject to the appointment of a receiver, or admits in writing its inability to pays its debts as they become due, or (ii) at any time provided at least 30 days' prior written notice is delivered by the terminating party to the other party.** In addition to any other rights and remedies of Manager, Owner will be obligated to pay all compensation and reimbursable expenses accrued or incurred through the date of termination.

**2.** MANAGER ACCEPTANCE: Manager accepts the appointment and shall be responsible for providing the services (and only the services) set forth on Exhibit A (the "Services"). Owner grants Manager the authority and power, at Owner's expense, to provide the Services.

3. OWNER RESPONSIBILITIES: Owner shall:

A. Provide all documentation, records and disclosures as required by law or required by Manager to manage and operate the Property, and immediately notify Manager if Owner becomes aware of any change in such documentation, records or disclosures, or any matter affecting the habitability of the Property.

B. Comply with, and ensure that the Property is in compliance with, all applicable laws, including, without limitation, reporting or notice requirements, zoning, occupancy laws (including but not limited to the maximum three unrelated individuals' laws of The Philadelphia Code) licensing (including, without limitation, licensing required to conduct business in the City of Philadelphia, such as (but not limited to) Commercial Activity License, Rental License, and Certificate of Rental Suitability, and permitting (including certificates of occupancy where such are required). Owner acknowledges that Manager is not an expert that is knowledgeable on all such laws, compliance and requirements addressed herein.

C. Indemnify, defend and hold harmless Manager, and all persons in Manager's firm, its employees, contractors and representatives, from all costs, expenses, suits, liabilities, damages, attorney fees and claims of every type, including but not limited to those arising out of injury or death of any person, or damage to any real or personal property of any person, including Owner, arising out of: (i) any act or omission of Owner or its owners (if an entity), managers (other than Manager), employees, contractors (including, without limitation, any person or entity that does any work on or about the Property), invitees (including, without limitation, tenants at the Property) or representatives; or (ii) relating to the Services of Manager or the performance or exercise of any of the duties, powers or authorities granted to Manager, whether performed by Manager or any of the indemnified persons above, unless caused directly and exclusively by Manager's gross negligence or willful misconduct; however, Manager shall not be liable, and Owner shall Indemnify, defend and hold harmless Manager (and all persons in Manager's firm, its owners, employees, contractors and representatives), under any circumstances related to injury or death of any person occurring from or related to Tenant and/or their guests or invitees activities or presence upon any and all decks, roof decks and/or roofs of any kind or (iii) any breach of this Agreement by Owner, including, without limitation, violation of any applicable law (including, without limitation, violation of number

11

of permitted tenants or any other restrictions on occupancy, whether imposed by a governmental agency, condominium association, city or township or otherwise) or any lapse in or failure by Owner to maintain insurance coverage, or (iv) Owner's ownership of the Property or performance or failure to perform the responsibilities of Owner set forth in this Agreement; or (v) any act or omission of Manager taken or omitted at the direction of Owner.

Notwithstanding the foregoing, any third parties hired by Manager to perform work on Owner's property pursuant to this Agreement, shall be licensed and insured and reasonably believed by Manager to be competent to perform the work it is assigned.

Owner understands and agrees that the provisions of subparagraph 3(c) are material to this Agreement and without which Manager would not enter into the Agreement and would not perform the services for the consideration provided in the Agreement.

      D. Be responsible for the overall repair, condition, improvement, cleanliness, operation and condition of the Property and its systems, and to protect the Property and the services and utilities for the Property, in a commercially reasonable manner and, without limiting the foregoing, in compliance with applicable laws and in a safe condition fit for human habitation. Manager shall make recommendations to Owner when Manager becomes aware of items required to be addressed to maintain the Property in accordance with the above. Manager is not responsible in any way if Owner rejects or fails to respond or authorize Manager's recommendations.

      E. Pay all interest on tenants' security deposits to the extent required by law.

      F. Carry and pay for: (i) public and premises general liability insurance in an amount of no less than $1,000,000; and (ii) Property damage and worker's compensation insurance adequate to protect the interests of Owner and Manager. Owner will name Manager as an additional insured on Owner's liability insurance and provide insurance certificates to Manager indicating the same.

      G. Maintain sufficient reserves for payment of, and timely pay, all expenses and costs associated with the Property or its operation, including, without limitation, property maintenance and management compensation (provided that, compensation of Manager under this Agreement shall be paid as provided in Section 4 below), fees and charges, expenses for goods, utilities and services, property taxes and other taxes, Owner's Association dues, assessments, loan payments and insurance premiums.

      H. Pay all costs and expenses associated with collection rent from tenants or tenant delinquencies or eviction, including, without limitation, legal fees and court costs.

    4. COMPENSATION:

      A. Owner agrees to pay Manager the Management Fee set forth on Exhibit A. Manager may deduct such Management Fee on a monthly basis from the rent and other monies collected for Owner. If Owner requests Manager to perform services not included in this Agreement, and if Manager agrees to perform such services, a fee shall be agreed upon before these services are performed.

      B. Maintenance and repairs performed by Manager's employees shall be billed at an hourly rate for labor plus materials.

      C. Work performed by vendors to be billed at cost with no mark-ups, except for:

        1) Turnover work which is not performed by Manager's employees.

        2) Renovations or work associated with property upgrade.

    D. Owner will reimburse Manager for all reasonable expenses incurred by Manager in performing services under this Agreement, including, without limitation, goods and services obtained through third parties. Manager shall not be obligated to advance Manager's own funds in connection with fulfilling its obligations under this Agreement.

    E. Owner further agrees that:

     (1) Manager may receive and keep fees and charges from tenants for: (i) requesting an assignment of lease or sublease of the Property; (ii) processing credit applications; and (iii) any other services that are not in conflict with this Agreement.

     (2) Manager may perform any of Manager's duties, and obtain necessary products and services, through affiliated companies or organizations in which Manager may own an interest. Manager may receive fees and/or profits from these affiliated companies or organizations, so long as the services provided are provided at costs similar to those charged by unaffiliated companies in the area for the same services. Manager shall disclose to Owner any other such relationships as they occur. Manager shall not receive any fees or profits from unaffiliated companies or organizations in the performance of this Agreement, without prior disclosure to Owner.

   5. OWNER'S REPRESENTATION. Owner represents that the Property is well-maintained, in good repair, free from defects, and that the appliances, fixtures, services and utilities for the Property are in good and commercially reasonable condition and that the Property in all respects is in compliance with applicable laws and in a safe condition fit for human habitation. Owner is responsible for any and all inaccuracies in this representation and any and all losses, claims, judgments or injuries arising from the same.

   6. **LIABILITY LIMITATIONS. Manager shall only be liable to Owner for, and will indemnify, defend and hold harmless Owner from and against, all liabilities, claims, costs and damages (including reasonable attorneys' fees) arising out of, but only to the extent any such loss or damage is caused by, the gross negligence or willful misconduct of Manager. Manager will not be liable to Owner or any other person or entity for any other liabilities, claims, costs or damages, including, without limitation, any personal injury or property damage, whether caused by Manager or any other person, the Services or otherwise. In the event Manager will be liable for any reason to Owner (whether in contract, tort, negligence, strict liability, by statute or otherwise), then the liability of Manager will not exceed, in the aggregate, the <u>greater of (x) $25,000 or (y) the</u> compensation paid to Manager under this Agreement for the twelve (12) months immediately preceding the event giving rise to the liability; <u>provided, however, the foregoing liability limitation shall not apply to the willful misconduct or bad faith of Manager or employees of Manager</u>.**

The foregoing is subject to and further limited by the following: Manager shall not be liable, under any circumstances related to injury or death of any person occurring from or related to Tenant and/or their guests or invitees activities or presence upon any and all decks, roof decks and/or roofs of any kind.

**Neither party will be liable to the other for any type of incidental, punitive, special, exemplary, reliance, indirect or consequential damages, regardless of the foreseeability of such damages.**

Owner understands and agrees that the liability limitations of Paragraph 6 are material to this Agreement and without which Manager would not enter into the Agreement and would not perform the services for the consideration provided in the Agreement.

   7. AGENCY RELATIONSHIPS: Manager shall act, and Owner hereby consents to Manager acting, as the agent for Owner in all matters contemplated by this Agreement. Owner understands that Manager may have or may obtain property management agreements on other property, and that potential tenants may consider, make offers on, or lease property the same as or similar to Owner's Property. Owner consents to Manager's management of other owners' property before, during and after the expiration of this Agreement.

8. **NOTICES:** Any written notice to Owner or Manager required under this Agreement shall be served by sending such notice by first class mail, electronic mail (e-mail), recognized overnight carrier such as FedEx or UPS, or other agreed-to delivery method to that party at the address below, or at any different address the parties may later designate for this purpose. Notice shall be deemed received three (3) calendar days after deposit into the United States mail or upon receipt or first refusal if delivered by FedEx or UPS or email. Owner consents to notices being exchanged with Manager by e-mail. Owner shall be responsible to advise Manager of any change in Owner's preferred e-mail address.

9. **EQUAL OPPORTUNITY:** The Property shall be managed by Manager in compliance with federal, state and local anti-discrimination laws.

10. **ATTORNEY FEES:** In any action, proceeding, mediation or arbitration between Owner and Manager regarding the obligation to pay compensation or otherwise perform under this Agreement, the prevailing Owner or Manager shall be entitled to receive from the non-prevailing Owner or Manager reasonable attorney fees and costs actually incurred.

11. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence under this Agreement. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their agreements with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing, signed by the party intended to be bound. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

12. **OWNERSHIP; AGREEMENT:** Owner warrants that Owner is the owner of the Property and has the authority to execute this Agreement. Owner acknowledges that Owner has read, understands, accepts and has received a copy of this Agreement.

13. **MISCELLANEOUS.** This Agreement and the enforcement hereof shall be governed by the laws of the Commonwealth of Pennsylvania. Each of the parties hereby consents to the exclusive jurisdiction and venue of the federal and state courts located in Philadelphia County, PA. This Agreement shall be binding on the parties and their respective successors and permitted assigns. This Agreement may not be assigned, directly or indirectly (including, without limitation, by merger or change of control), without the prior written consent of the other party.

**[SIGNATURE PAGE FOLLOWS**

14

**OWNER:**

15th Street Lighthouse LP

| | | |
|---|---|---|
| *Rickey Biddle* (DocuSigned) | Rickey Biddle | 8/19/2021 |
| SIGNATURE | TITLE: Manager | DATE |

15th Street Lighthouse LP
P.O. Box 15010, Philadelphia, PA 19130
Attn: Rickey Biddle

215-765-1429

Email: rickey@rmdevelopmentpartners.com

**MANAGER**

| | | |
|---|---|---|
| *Ohad Feigenbaum* (DocuSigned) | Ohad Feigenbaum | 8/19/2021 |
| SIGNATURE | TITLE: President | DATE |

OHAD FEIGENBAUM, PRESIDENT

PIP PROPERTY MANAGEMENT, LLC.

4422 Route 27, Kingston, NJ, 08528

1-609-921-3257
pipmgt@pipinc.com

www.pipinc.com

NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION.  IF YOU DESIRE LEGAL, TAX OR  BROKERAGE ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL

15

PIP Property Management, LLC
Real Property Management Agreement
<u>Exhibit A</u>

1. Properties:

1330 N 15th Street Philadelphia, PA 19121

2. Start Date: August 17, 2021

3. Management Fee: Seven percent of the monthly rent collected and all other rentable items including but not limited to amenity, parking and storage fees (7%). Management fee shall not be charged on cost reimbursement items such as water fees.

4. Utility Management Fee: $5 per unit per month. The utility management fee covers Manager's cost of paying utility bills, water bills, billing tenants for fixed utility charges and handle utility transfer during turnover

5. Services:

RENT COLLECTION: Deposit all rent and other monies collected for Owner in a financial institution whose deposits are insured by an agency of the United States government. Owner's funds shall be held in an account separate from Manager's personal accounts. Manager shall not be liable in the event of bankruptcy or failure of any such financial institution.

SECURITY DEPOSITS: Receive security deposits from tenants (which deposits shall be placed in a separate subaccount and managed by Manager). Manager shall be responsible to tenants for the return of security deposits within the time periods proscribed by law and detailing any itemized list of damages deducted from the return of such security deposits.

TENANCY TERMINATION: Sign and serve, in Owner's name, notices that are required or appropriate; commence and prosecute actions to evict tenants (with prior approval of Owner and counsel reasonably approved by Owner); recover possession of the Property, in Owner's name; recover rents and other sums due; and, when expedient, settle, compromise and release claims, actions and suits and/or reinstate tenancies.

EXPENSE PAYMENTS: Pay expenses and costs for the Property from Owner's funds held by Manager, unless otherwise directed by Owner. Expenses and costs may include, but are not limited to, property management compensation, fees and charges, vendor bills, expenses for goods and services, property taxes and other taxes, Owner's Association dues, assessments, loan payments and insurance premiums.

REPAIR AND MAINTENANCE: Make, cause to be made, and/or supervise repairs, improvements, alterations and decorations to the Property; purchase, and pay bills for, services and supplies. Manager shall obtain prior approval of Owner for all expenditures over $600 for any one item. Prior approval shall not be required for monthly or recurring operating charges or, if in Manager's sole judgment, emergency expenditures over the maximum are needed to protect the Property from damage, prevent injury, avoid suspension of necessary services (whether or not required in leases or by law), avoid penalties or fines, including, but not limited to, maintaining the Property in a condition fit for human habitation.

RESERVES: Maintain a reserve in Owner's funds held by Manager of not less than $150 per unit held by Manager.

OWNER DISTRIBUTION: Remit balance of available Owner funds to Owner monthly after deducting all costs form rent collected.

OWNER STATEMENTS: Render monthly statements of receipts, expenses and charges for the Property.

The Services shall not include, without limitation, any responsibilities of Owner set forth in the Agreement.

Manager shall not act as a Realtor, and shall be responsible to retain JBMP Group, who will be responsible for all advertising, rental and leasing activities regarding the Property, including the preparation and execution of the leases.

This Agreement does not include, among other things, providing a full-time on-site manager, property sales, refinancing, preparing Property for sale or refinancing, overseeing extensive renovations and modernization, fire or other casualty damage restoration, rehabilitation, obtaining income tax, accounting or legal advice, representation before public agencies, advising on proposed new construction, debt collection, and counseling.

17